John W. Williamson, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

John W. Williamson and Inez Williamson, Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 30226, 30227. Promulgated June 25, 1952.

**654**

*John C. Bruton*, *Esq.*, and *John H. Lumpkin*, *Esq.*, for the petitioners.

*F. L. Van Haaften*, *Esq.*, for the respondent.

FINDINGS OF FACT AND OPINION.

RAUM, *Judge:* The petitioners, husband and wife, reside in Norway, South Carolina. The income tax returns involved, for the years 1945 and 1946, were filed with the collector of internal revenue for the district of South Carolina. The Commissioner asserted deficiencies for each of these years in the amounts of $2,725.59, and $35,887.59, respectively. John W. Williamson will be referred to hereinafter as petitioner.

The only question in issue is whether the profit derived from the sale of cotton owned by petitioner in each of the years shall be taxed as ordinary income or as capital gain. The Commissioner contends that the cotton did not constitute capital assets within the meaning of section 117 (a) of the Internal Revenue Code.[1] Some of the facts have been stipulated, and the stipulation is incorporated herein by reference.

Petitioner is 64 years of age. His business during most of his adult life has involved cotton. Since at least 1940 his activities with respect to cotton have included at least the following: (a) ownership of some 1,000 or 1,200 acres [2] of land in or near Norway, South Carolina, which·was farmed by sharecroppers and in which cotton was an important crop; (b) ownership and operation of a cotton gin in Norway, South Carolina; (c) ownership and operation of a cotton warehouse, bonded under Federal laws; (d) ownership and operation

---

[1] SEC. 117. CAPITAL GAINS AND LOSSES.

    (a) DEFINITIONS.—As used in this chapter—

        (1) CAPITAL ASSETS.—The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

            (A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business ;

      *          *          *          *          *

[2] Mrs. Williamson owned about 200 acres of the foregoing, but they were treated by petitioner as though they were under the same ownership. Of the total acreage, some 700 or 800 acres represented cleared land.

of two cotton seed warehouses; and (e) ownership and operation of a small "mercantile" store which sold fertilizer and other supplies to nearby farmers. The store, warehouses, and gin were within comparatively short distances of each other, and were close to a railroad siding.

It was the practice of farmers in the vicinity of Norway, both petitioner's sharecroppers as well as others, to have their cotton brought to petitioner's gin,[3] and after it was ginned to have their bales placed on the railroad siding. Moreover, it was expected of petitioner and it was customary for him, each year, to purchase the bulk of such baled cotton from the farmers, usually about 80 per cent of the cotton which passed through his gin. In purchasing such cotton each year, it was petitioner's intention to resell at a profit. Also, since many of the farmers were indebted to him for fertilizer and other supplies which had been sold to them at petitioner's store, his purchase of their cotton enabled him to effect collection on such indebtedness. He purchased cotton in the foregoing manner each year from about 100 to 150 farmers. The farmers were personally known to him; he did not purchase cotton from strangers.

In disposing of the cotton thus acquired from the farmers, petitioner had at least several alternatives open to him. He could resell the bales of cotton at once as "spot" cotton, expecting thereby to realize a small profit. Or, if petitioner felt that the market would rise during the ensuing months he could place the cotton in a warehouse, and sell later when he thought that the opportune moment had arrived. If petitioner adopted the latter course, he would have to bear the cost of storage, to the extent that the cotton was not placed in his own warehouse, as well as charges for insurance. A still further alternative was available to him, which he in fact employed during the tax years in controversy, and which enabled him to profit by a rise in the market just as though he had stored the cotton for sale at a subsequent time.

Under the third method he would place his cotton "on call" with one or more cotton merchants with whom he regularly dealt. This method operated as follows: pursuant to arrangement between himself and the cotton merchant, petitioner would ship the cotton at once to the merchant, parting with possession of the cotton; the cotton would come under the control of the merchant who could at any time resell the cotton; a provisional price would be fixed for the cotton based on market quotations on the day the particular "call" transaction was initiated; petitioner would be allowed to draw at once 80 per cent of such price; and petitioner would, at any time on or before the "call date" notify the merchant to fix the actual price

---

[3] A gin operated by a competitor was adjacent to petitioner's gin.

based upon the market as of the date of such notification. If the market turned downward prior to the date of notification, or "call," petitioner could be required to pay the cotton merchant an amount so that a margin of not less than 20 per cent remained between the current market value of the cotton and the net amount paid by the merchant to petitioner up to that time. Similarly, if the market should rise, petitioner could require the merchant to make additional payment to him from time to time, so that the 20 per cent margin would be maintained. Final settlement between the parties was based on the market on the "call date." No interest was paid either by petitioner or the merchant. Although one or two witnesses referred to the 80 per cent paid over to petitioner by the merchant as "loans" or "advances," we are satisfied that they did not constitute loans, and that they were merely tentative part payments for cotton which petitioner sold at once to the merchant, the ultimate price to be determined by reference to market conditions as of some future date. Petitioner did not enter into any "hedging" transactions.

Petitioner's purchases of cotton from the farmers and the resale of, such cotton, whether by spot sales, or "call" arrangements or otherwise, were not casual or occasional transactions. They were a significant and regularly recurrent aspect, each season, of his overall cotton business. The few cotton merchants to whom he sold the cotton were his regular customers in the course of business.

Petitioner described himself as a "speculator" in relation to these transactions. True, his "call" arrangements between himself and the cotton merchants were so fashioned as to place upon him the risk of the market between the date of shipment of the cotton and the "call" date; but the fact remains that he was selling cotton, acquired in the regular course of his business, and that his purchasers were regular customers. In the circumstances, such cotton was not a capital asset within the meaning of section 117 (a), and the gain on disposition must be taxed as ordinary income.

We have been referred to an unreported decision rendered by the United States District Court for the Eastern District of South Carolina involving a claim for refund by petitioner apparently with respect to the year 1943, in which the court held that certain sales of cotton in that year were to be treated as sales of capital assets. However, we do not have before us the record in that case, and we do not know exactly what was before the court for decision. We are satisfied, on the present record, that the sales in controversy were not sales of capital assets.

*Decisions will be entered under Rule 50.*