W. L. and Marguerite Gladish v. Commissioner.
Gladish v. Commissioner
Docket No. 52089.
United States Tax Court
T.C. Memo 1956-14; 1956 Tax Ct. Memo LEXIS 286; 15 T.C.M. (CCH) 62; T.C.M. (RIA) 56014; January 19, 1956
*286 During each of the taxable years in question, petitioner W. L. Gladish sold cotton to cotton merchants with "on call" arrangements as part of the transactions. As a result of the integrated arrangements, the ultimate sales price was determined by reference to market prices as of future dates when Gladish notified the merchant to fix the price. The merchant was a customer, and the sales were made to him in the ordinary course of seller's business. Held, that the cotton so sold was not a capital asset (section 117(a)(1)(A), Internal Revenue Code of 1939) and the profit derived from the disposition thereof was taxable as ordinary income. F. F. Locke, Esq., and Hiram W. Holtsford, Esq., Lawrenceburg, Tenn., for the petitioners. Homer F. Benson, Esq., and J. Frost Walker, Esq., for the respondent. FISHER
*287 Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income taxes and penalty in the amounts and for the fiscal years set forth below: Penalty
Sec. 294(d)(2)
Year Ended
Deficiency
I.R.C. of 1939
2/28/47
$ 61,709.74
2/29/48
39,654.79
2/28/49
5,525.12
2/28/50
7,915.12
2/28/51
126,583.82
$10,884.44
W. L. Gladish will hereinafter be referred to as petitioner. Said petitioner sold cotton to customers (cotton merchants) in the ordinary course of business, with "on call" arrangements, as a result of which the ultimate sales price was determined by reference to market prices as of futures dates. The only issue is whether the profits realized from such sales were taxable as ordinary income or capital gains. Findings of Fact Some of the facts are stipulated and are incorporated herein by reference. W. L. Gladish and Marguerite Gladish, husband and wife, were residents and citizens of Lawrenceburg, Tennessee, during the taxable years involved. W. L. Gladish filed an individual Federal income tax return for each of the fiscal years ended February 28, 1947, and February 29, 1948, and W. L. Gladish and Marguerite Gladish *288 filed a joint Federal income tax return for each of the fiscal years ended February 28, 1949, February 28, 1950, and February 28, 1951, with the director of internal revenue for the district of Tennessee, Nashville, Tennessee. The returns were filed on the cash receipts and disbursements method of accounting, which method was used by the petitioner, W. L. Gladish, in his business. For several years prior and during the taxable years involved, W. L. Gladish, who is sometimes hereinafter referred to as the petitioner, owned and operated cotton gins. During some or all of the said taxable years, he owned and operated a cotton gin in each of the following places: Lawrenceburg, Pulaski, Ethridge, and Savannah, Tennessee, and Huntsville, Alabama. In connection with his cotton ginning operations, petitioner, during the taxable years involved, purchased substantially all the cotton which he ginned from farmers patronizing his gins. Such purchases were made in small lots largely during the ginning seasons beginning in September and ending in late January or February. During the taxable years involved, more than half of the cotton which petitioner sold was disposed of by "on call" sales. *289 According to the provisions of such sales the petitioner delivered "spot" cotton in lots of 50 or 100 or more bales of an average weight of approximately 500 pounds per bale to the buyer or buyers who are known to the trade as cotton merchants. A provisional price was agreed upon when the cotton was delivered. In addition, where the sale was made "on call," the call agreement, which was an integral part of the sale, provided that the final settlement for the cotton would be made on the basis of the price of cotton for a designated futures contract month as of the date the seller called on the buyer to fix the price. The provisional price was fixed on the basis of market quotations on the day the particular call transaction was initiated. The seller, for standard grade 15/16 inch cotton, received the quoted price, after adjustments for weight and grade, less from two to eight cents per pound retained by the merchant (buyer) as a margin until final settlement under the terms of the call features of the agreement as protection against the fluctuation of prices for the futures month designated by the agreement. The buyer could require the seller to put up additional margin in event the *290 retained margin became insufficient under the terms of the margin agreement (which was part of the "call" contract) as a result of market fluctuations in the price of cotton. If the seller failed to put up additional margin when demanded, the buyer could fix the price of the cotton and close the transaction. If the price of cotton rose sufficiently to make the margin retained excessive, the seller would be entitled to receive the excess over margin requirements. By stipulation, the parties introduced into evidence a typical "on call" contract. Petitioner was designated as the seller, and Hohenberg Bros. Company (the cotton merchants with which petitioner regularly dealt) was designated as the buyer. In addition to further provisions not here material, the contract included the following: "Price 14 points off July N. Y. B/M 15/16 Seller Call * * *
"This contract to sell cannot be transferred without consent of sellers. "Subject to mutual margin agreement on back hereof, which is hereby agreed to."
On the reverse side of the contract, the mutual margin agreement was typed in the following language: "Note: Margin Of Three Cents (3") per pound to be deducted from Invoice. *291 Said margin to be maintained at all times until the price is fixed. In event of decling in the market and margin call is made by Hohenberg Bros. Company and seller fails to respond immediately to said call Hohenberg Bros. Company reserves the right to fix the price immediately at the best price obtainable during market hours." Petitioner could, at any time on or before the agreed "call date," notify the merchant to fix the actual price based upon the market as of the date of such notification. Final settlement between the parties was based on the market on the "call date." The call and margin provisions were integral factors in the agreement for "on call" sales of cotton. The "on call" sales herein involved were sales of cotton held by petitioner primarily for sale to customers in the ordinary course of petitioner's business. "On call" agreements are made only in connection with and as a part of contracts for the sale of "spot" cotton. The fluctuation of the futures market furnishes a facility for speculation through the medium of "on call" contracts. Original brokerage was absorbed at the time of the sale of the "spot" cotton, but if the transaction was transferred from one *292 month to a future month, brokerage was charged. The provisional prices received by the petitioner for cotton sold "on call" were usually less than his actual cost of the cotton and would have resulted in losses if the transactions had been considered closed at the time the cotton was delivered. Whether the petitioner would realize profit or loss from the "on call" sales could not be determined until final settlements were made on the prices as fixed on the seller's call. Petitioner usually sold cotton"on call" in lots of 50 or 100 or more bales which were delivered to the buyer who took title and possession as of the date the contracts were entered into and delivery made. Thereafter, the sellers were principally interested in the price of cotton for the designated contract month on the basis of which final settlement on the "on call" sale of "spot" cotton was to be made. The seller could, by call, fix the price of the cotton sold "on call" at any time prior to the closing date of the futures contract month which is the 25th of the month prior to the designated contract month. The seller could, with the buyer's consent, have the contract transferred to a subsequent active market *293 month as the basis for fixing the final settlement price of the cotton sold "on call." Petitioner did not at any time buy, sell or own any futures contract during any of the taxable years involved, and the cotton merchant did not buy or sell any such futures contract in petitioner's name or on his behalf. The petitioner owned bonded warehouses and deliveries of"spot" cotton sold "on call" were usually made or effected by petitioner issuing warehouse receipts to the buyer for the number of bales covered by the "on call" contracts. The cotton thus delivered was stored at buyer's expense in petitioner's warehouse until shipped at the buyer's order. During the taxable years sales of spot cotton were largely to one buyer, Hohenberg Bros. Company, a cotton merchant whose principal office was in Memphis, Tennessee, with agents in the cotton producing states and several foreign countries. Hohenberg Bros. Company had access to a seat on the New York Stock Exchange through one of its stockholders who owned a seat on the Exchange. Petitioner's sales of "spot" cotton included sales without entering into call contracts as well as sales with call contracts. Only the latter are involved in *294 the instant case. In both types of transactions, the buyers took title and possession of the cotton as of the date on which the transactions were entered into. Opinion FISHER, Judge: During the taxable years in question, petitioner operated several cotton gins. He bought substantially all of the cotton for his ginning operations from farmers, and sold it to cotton merchants after it was baled, the sales to such customers being clearly in the ordinary course of his business. It was equally clear that the cotton was held primarily for that purpose. Petitioner's main customer was Hohenberg Bros. Company, cotton merchants. Some of petitioner's sales during said years were "spot" sales, but more than half were "on call." In "spot" transactions, an outright, final sale was made, possession and title passed at once to the customer, and the full amount of the contract price, subject to adjustments for weight and quality (not here material), was paid or credited to the seller(petitioner). "On call" sales were made only in connection with "spot" sales, and differed from "spot" sales only in that the following features were added to the "spot" sale arrangement: the merchant buyer retained *295 a margin of from two to eight cents per pound (the amount of the margin being fixed by the call contract)., the seller was granted a specified period within which he might call the contract; and the ultimate price was fixed upon the basis of the market prevailing at the date of the actual call notification. In the interval between delivery to the merchant and the call by the seller, the risk of market fluctuation was upon the seller. If the market retreated, the merchant could require the seller to make payments to preserve the margin initially established. Any ultimate loss was paid by the seller. If the market advanced, the seller could require the buyer to make payments to him to the extent of the excess over the margin requirements. Any ultimate gain accrued to the seller. The petitioner as seller did not purchase or sell any futures contracts, and none were purchased or sold on his behalf. Petitioner concedes that the "spot" sales were made to customers in the ordinary course of business and that the resulting profits or losses were not entitled to capital gains treatment. With respect to sales "on call," however, he maintains that the call features of the transaction were *296 separate and distinct from the accompanying "spot" sales; that by use of the call arrangement, he was speculating on the market, and that his profits therefrom should receive capital gains treatment. He does not deny that he was able to make call arrangements only in connection with "spot" sales, nor does he assert that the added call features were other than a device to permit him to speculate on the market in connection with his "spot" sales. While he claims that he was in the same position as an investor in commodity futures, he did not at any time purchase or sell futures contracts or claim that any were purchased or sold on his behalf. In connection with the added features of the call transaction, the only actual sale made by petitioner was the sale of his cotton to the merchant as an integral part of the agreement. The applicable section of the Internal Revenue Code, § 117(a)(1)(A) vides: " § 117. Capital gains and losses "(a) Definitions. As used in this chapter - "(1) Capital assets. The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include * * * "(A) stock in *297 trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;" * * *
A like problem was presented to us in John W. Williamson, 18 T.C. 653 (152); aff. (C.A. 4, 1953) 201 Fed. (2d) 564; certiorari denied 345 U.S. 970, and we there upheld respondent's position. We think that case is here controlling. The nature of "spot" and "call" transactions was fully discussed in both our own Opinion and that of the Court of Appeals, and while Williamson, supra, differs in some of its details from the instant case, it is clear, upon careful examination, that the principles involved in the two cases are identical. In considering taxpayer's ultimate contention in Williamson, supra, (which was substantially the same as that of petitioner in the instant case), the Court of Appeals said, in part (p. 567): "Finally, taxpayer points out that when he sells his cotton in 'spot' transactions, he assumes no price risk; but *298 that when he disposes of it on 'call' arrangements, he assumes the risk of market fluctuations. It is this difference which lies at the heart of taxpayer's claim for a tax advantage. Despite the holding of the Tax Court that the sales in question were made in the ordinary course of business, the taxpayer contends that the tax consequences where he does not assume the risk of market fluctuations and where he does assume that risk must be different. "The short answer to that contention is that the taxing statute recognizes no such distinction, and we are not permitted to create one by judicial interpretation. To do so would not only subvert the purpose of the statute but do violence to its express language. * * *" We have carefully considered the cases referred to in petitioners' brief. We think it sufficient to say, without extending our discussion, that they involve transactions in futures contracts under circumstances which have no relation to the problem here under consideration. In the light of the foregoing discussion, we hold that the profits from petitioner's "on call" transactions for the years in question are taxable as ordinary income and not as capital gains. Petitioners *299 assigned no error and raised no question on brief with respect to the determination of penalties under section 294 (d)(2) for the year ended February 28, 1951. It is apparent without further discussion that penalties will apply, and will be included in the decision under Rule 50. With respect to the year ended February 28, 1947, error was assigned in relation to the inclusion as income the sum of $45,000 which petitioners had included in their return for the previous year. At the trial, both parties agreed that this would result in duplication of taxes unless appropriate adjustment was made. It was indicated that administrative details had not been worked out, but that the parties would probably be in a position to stipulate an agreed result which could be reflected in our Rule 50 determination. Neither party argued the issue on brief, and we assume that they have reached an agreement on the issue. We therefore find it unnecessary to consider the issue in this Opinion. Decision will be entered under Rule 50.