CHARLIE HILLARD AND MARY JANE HILLARD, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 61604.    Filed February 9, 1959.

*George S. Atkinson, Esq.*, and *Tom B. Rhodes, Esq.*, for the petitioners.
*David E. Mills, Esq.*, for the respondent.

968

OPINION.

RAUM, *Judge:* Petitioner's sales of his used rental cars were neither occasional nor casual. They were not a mere incident of his business. They were a steady and continuous source of recurrent income to him and represented an integral part of his so-called rent-a-car business. Cf. *John W. Williamson*, 18 T.C. 653, 656, affirmed 201 F. 2d 564 (C.A. 4), certiorari denied 345 U.S. 970. These considerations are highly relevant when examined in the light of the congressional purpose in giving preferential treatment to capital gains and in the light of the proper judicial approach to the problem, as set forth by the Supreme Court in *Corn Products Co.* v. *Commissioner*, 350 U.S. 46, 52:

But the capital-asset provision of § 117 must not be so broadly applied as to defeat rather than further the purpose of Congress. *Burnet* v. *Harmel*, 287 U.S. 103, 108. Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by § 117 applies to transactions in property which are not the normal source of business income. It was intended "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." *Burnet* v. *Harmel*, 287 U.S., at 106. Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly. This is necessary to effectuate the basic congressional purpose. This Court has always construed narrowly the term "capital assets" in § 117. * * *

Cf. *S.E.C. Corporation* v. *United States*, 140 F. Supp. 717 (S.D. N.Y.), affirmed per curiam 241 F. 2d 416 (C.A. 2), certiorari denied 354 U.S. 909.[1]

---

[1] In the *S.E.C. Corporation* case, the court said (140 F. Supp. at 720):
"To carve out of its business for special tax treatment gain actually realized as a normal feature of the taxpayer's current business would not be consonant with the meaning and purpose of this statute."

Turning to the governing statutory provisions herein we find that the benefits of the capital gains rates are available with respect to certain property used in the taxpayer's trade or business, but that such benefits are withheld in the case of "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." Sec. 117(j)(1)(B). Were the vehicles herein held by petitioner primarily for sale to customers in the ordinary course of his trade or business? We think, upon an appraisal of all the evidence, that the answer must be in the affirmative.

Petitioner, in his returns, originally treated the rental cars as having a normal useful life of 3 years; and the Commissioner's determination, agreed to by petitioner, fixed that period at 4 years. Yet, it was petitioner's practice to sell the cars after they had been in use for only about a year. Thus, when he purchased the cars in the first instance it was plainly his intention to use them in the rent-a-car operation for a comparatively minor portion of their useful life and then to sell them. This was a dual objective. But was the intention to sell merely an incidental or consequential purpose? Or was it a "primary" purpose that was dominant from the beginning? Our view of the evidence leads us definitely to the conclusion that petitioner held the cars in question primarily for sale. The use of the cars for rental purposes was merely an intermediate stage prior to their final and most profitable use, namely, sale, and we are satisfied that such final use was the dominant consideration that led to their purchase in the first instance. Sale of the vehicles was more than "the natural conclusion of the rental cycle." It was the primary reason for commencing the rental cycle.[2]

Petitioner's returns for both taxable years, ending June 30, 1952 and 1953, are in evidence. They show that petitioner reported net losses in the amounts of $29,835.51 and $39,520.04 for those years with respect to his activities in renting cars, but that in the same years he realized gains in the amounts of $92,708.68 and $91,025.95 upon sale of rental cars held for more than 6 months. True, these amounts were later revised—in 1955—as a result of a revenue agent's depreciation adjustments, so as to convert the foregoing rent-a-car losses into profits of $15,574.41 and $10,290.85 for the 2 years in controversy, and to reduce the foregoing gains on sale to $54,673.97 and $48,530.02 for such years. But the figures reported by petitioner on his own returns are far more relevant in probing his intention at the time of acquisition of the cars than the figures which resulted from a revenue agent's subsequent adjustments.

---

[2] The fact that petitioner's "fleet user" and "fleet owner" agreements were inapplicable to vehicles purchased for resale is irrelevant in determining the purpose for which petitioner held the vehicles, since the agreements were clearly referring to resale *as new cars*, and not as used cars.

Petitioner appeared as a witness, and we had ample opportunity to observe him and reach conclusions as to his credibility. He impressed us as being an intelligent, astute, and perceptive businessman. However, he was evasive at crucial points. In response to inquiries which drew his attention to the relative profits from the leasing and sales operations with respect to rental cars and brought into question whether that consideration played any part "in the determination of the acquisition of these cars," petitioner replied merely:

I submit I spent night and day looking after leasing and getting the revenue from, and buying new cars, and replacing them. I don't know what the figures were a year and a half later.

Although the questions were not artfully formulated, we are satisfied that petitioner fully understood what Government counsel was driving at, and that his answer was either deliberately evasive or false.

Another aspect of the evidence will also illuminate the reason for our lack of confidence in petitioner as a witness. The question was raised whether petitioner, as a result of his volume purchasing, was able to buy cars more cheaply than an ordinary purchaser. This had some bearing upon the potential profit at the time of ultimate resale and the part which such potential profit might have played in the petitioner's intention at the time of purchase. He gave vague answers in terms of "supply and demand," and only upon being pressed did he admit with apparent reluctance (which is not reflected in the mere words of the transcript) that he could negotiate a better price per unit as a consequence of his quantity purchasing. However, without specifically stating how great his price advantage might have been, he distinctly left the impression that there was not "much difference" in the comparative prices. Yet, a later witness, who was associated with one of the dealers from whom petitioner purchased cars testified that the discount "would be closer to $200" than to $100. And upon further questioning he stated that: "I don't think we could have gotten the [petitioner's] business if it [the discount] had run less than that [$200]." We find that witness's testimony credible.

We have no confidence in petitioner's testimony or the implication that he sought to have the Court draw therefrom that his purchase of the cars was not motivated predominantly by the anticipated profit upon ultimate resale. It puts too much strain upon our credulity. He is a sagacious businessman, and we do not believe him to the extent that he testified or implied that his principal intention was to engage in a business that was unprofitable, as shown in his own returns, or that was far less profitable than the sales even as measured by the revenue agent's subsequent adjustments. The burden of proof was upon petitioner. It has not been carried here. Of assistance in trying to ascertain petitioner's intention would have been his com-

parative earnings in the rental and sales aspects of his business for the years prior to 1952 and 1953. An inquiry as to whether the pattern for 1950 and 1951 was materially different from that in 1952 and 1953, the years directly in controversy, brought forth no illuminating response. Bearing in mind that the burden was upon petitioner, it cannot be assumed in his favor without proof that the years before the Court were abnormal in this respect.

We are constrained to conclude that petitioner has not proved that he is entitled to the preferential treatment that he seeks, and we find as a fact on this record that petitioner's primary (although not exclusive) purpose in acquiring the cars in question was to derive a profit upon their ultimate sale. Whatever may be said of the result reached in *Philber Equipment Co.*, 25 T.C. 88, reversed 237 F. 2d 129 (C.A. 3), relied upon by petitioner, we find upon the record herein that petitioner held the cars in question primarily for sale to customers in the ordinary course of his trade or business.

*Decision will be entered under Rule 50.*