ESTATE of Mary Z. BRYAN, deceased, Byron E. Bryan, Executor, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent (three cases).

ESTATE of James E. BRYAN, deceased, First Citizens Bank & Trust Co., Executor, Petitioner,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent.

COMMISSIONER OF INTERNAL REVENUE, Petitioner,

v.

ESTATE of Mary Z. BRYAN, deceased, Byron E. Bryan, Executor, Respondent.

Nos. 9675–9679.

United States Court of Appeals Fourth Circuit.

Argued June 30, 1965.

Decided July 22, 1966.

Scott P. Crampton and Stanley Worth, Washington, D. C. (Korner, Doyle, Worth & Crampton, Washington, D. C., on brief), for petitioners in Nos. 9675, 9676, 9677 and 9678, and respondent in No. 9679.

Thomas L. Stapleton, Attorney, Department of Justice (Louis F. Oberdorfer, Asst. Atty. Gen., and Lee A. Jackson and David O. Walter, Attorneys, Department of Justice, on brief), for respondent in Nos. 9675, 9676, 9677 and 9678, and petitioner in No. 9679.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and BOREMAN, Circuit Judges.

HAYNSWORTH, Chief Judge:

These petitions for review of decisions of the Tax Court of the United States present but two issues for consideration.

James E. Bryan and Mary Z. Bryan were husband and wife residing in North Carolina. They owned Bryan Sand and Rock Company, which was engaged in the quarrying of sand, rock and gravel. Until May 1952 Bryan Rock was a corporation of which James and Mary were the only shareholders. On April 30, 1952, the corporation was liquidated and the business was continued under the same name, but as a partnership with James and Mary as co-partners. Upon James' death in 1953, the partnership was dissolved and, pursuant to James' will, a limited partnership was formed with Mary as general partner and James' executor as limited partner. Each had an equal share in the profits of the enterprise.

The life of the limited partnership was cut short, after only 4½ years, by the death of Mary on July 9, 1957. The business was continued until July 31, 1957, when liquidation was completed and a sale to a corporation controlled by the executors was consummated. Several years later a sale of the stock of this cor-

poration was made to an unrelated corporation.

The Commissioner assessed deficiencies in income taxes paid for the years 1955, 1956, 1957 and 1958. The taxpayers[1] questioned these assessments in the Tax Court and, by amended petition there, presented a claim for additional depreciation deductions for the tax years 1955, 1956 and 1957. The Tax Court determined deficiencies for the years challenged by the Commissioner and disallowed the deductions for additional depreciation claimed by the taxpayers.

Review in this Court has been sought by the taxpayers on only two of the issues in controversy below, both of which concern years in which the business was operated as a limited partnership.

## I.

During the taxable periods in controversy[2] Bryan Rock owned over 300 pieces of depreciable property, including power shovels, cranes, bulldozers, trucks and the like, as well as several structures. The depreciation basis for all items acquired prior to May 1, 1952, was the fair market value of the assets on that date as determined by one F. Lee Heidenreich when the corporation was liquidated on April 30 of that year.

All items were depreciated on a straight-line basis over useful lives determined by D. T. Bailey, managing executive and long-time key employee of the company, and the certified public accountants who prepared the tax returns in question. Bailey was familiar with each item and the particular use to whicn it was put. No salvage value was deducted from the basis of the assets in figuring annual depreciation, for the partnership's excellent maintenance and repair policies permitted it to use property until the end of its physical life. It was then sold as scrap and the receipts therefrom returned as ordinary income.[3]

Bailey was unaware that the useful lives he assigned the items were generally longer than those set forth for the construction industry by the Internal Revenue Service depreciation guide known as Bulletin F, and that the depreciation rates were correspondingly lower. His estimates were based on his considerable experience in the industry, and on the repair and maintenance experience of the partnership. It is not contended that the useful lives set by Bailey were unreasonable in view of the then known circumstances. In fact, the taxpayers experienced no dissatisfaction with the depreciation deductions until after the death of Mary in 1957.

At that time another appraisal of the assets was made by Heidenreich. Between the two appraisals the replacement cost, new, of the portable equipment used by the partnership had increased, due to inflation, almost thirty per cent. The taxpayers contend that when they deduct this "inflationary element" from the 1957 appraised value, the net, non-inflated market value of the portable property is almost $500,000 lower than the depreciated basis. This, they assert, conclusively indicates that the rates of depreciation utilized were too low. They now seek to claim, retroactively, the generally shorter useful lives suggested for comparable equipment in Bulletin F, thereby increasing the total depreciation deductions for the years in question by an amount approximately sufficient to reduce the unrecovered cost to the calculated 1957 market value without the inflation increment.

The Tax Court, after hearing the testimony of Bailey, the accountants and others, and after studying the exhibits offered, found that the original useful life estimates were more accurate than those sought to be retroactively substituted. As this finding is amply supported by the evidence, we affirm the Tax

1. The executors of the two partners.

2. Covered by returns filed for periods ending January 1, 1955, January 1, 1956, January 1, 1957 and July 1, 1957.

3. This practice was questioned by the Commissioner, who sought to require deduction of a salvage value, but approved by the Tax Court. No review has been requested on this issue.

Court's disallowance of the additional deductions.[4]

Preliminarily, we note that the taxpayer's reliance on Bulletin F is misplaced. Bulletin F merely represents the average experience in various designated industries, and sets forth the average useful lives of specified assets employed in each. Its use is restricted to those taxpayers who have inadequate industrial experience to make independent estimates, and it does not purport to promulgate lives which supersede the experience of a particular taxpayer.[5] Bryan Rock's use of property until the end of its physical life dissociates it from industrial averages. Its maintenance is said to have been quite superior.

Bryan Rock, acting through Mr. Bailey, had the capacity to, and did, estimate reasonable useful lives for its own assets.

Bailey, who had been with the company since 1941, and in a managerial capacity since 1946 or 1947, was personally familiar with each piece of equipment, as well as its use and maintenance. It had been his responsibility to replace property that did wear out. Moreover, Bailey had the advice of professional accountants who were familiar with the industry. They apparently relied on his expertise, for at no time did they suggest using the shorter lives suggested in Bulletin F. We conclude that in light of Bryan Rock's actual experience, the partnership is not now entitled to adopt the lives set forth in Bulletin F; we doubt that it ever was.

■■ Nor do we agree with the taxpayers' contention that inadequate depreciation is shown by the fact that the 1957 depreciated basis was higher than the then market value of the assets. The decline in actual value of an asset rarely, if ever, coincides exactly with the straight-line basis decline. The mere fact that, at midlife of an asset, its basis is either higher or lower than its market value indicates nothing, so far as we can see, about the accuracy of the useful life estimate. Such a variance could, and probably would, frequently occur even if the useful life could be predicted with absolute accuracy. A finding that a useful life estimate was excessive could not be based on this variance.

What this variance does suggest, if it is substantial and continuing, is that a more reasonable method of depreciation might have been selected. The Congress had in mind just this objection to the "rough and imperfect"[6] straight-line method when it approved optional methods permitting larger deductions in the earlier years of use.[7] Portable equipment acquired after December 31, 1953[8] could have been written off by one of the accelerated methods, but the partners elected in the returns to write them off on a straight-line basis.

We hold, in summary, that the taxpayers have failed to prove that the useful lives, as originally estimated by Mr. Bailey, approved by the partnership's accountants and accepted by the Commissioner, are too long. On this issue the Tax Court will be affirmed.

## II.

In the second issue there is a firmer foundation for the taxpayers' claim.

---

4. The Tax Court did not hold that under no circumstances may a taxpayer retroactively shorten his estimate of the useful life of a depreciable asset. Though the Commissioner urged that in this Court, the case does not present that issue for decision; we are required only to review the Tax Court's finding that the original estimates were the more reasonable. Prospective changes in remaining useful life are allowed only when there is a "clear and convincing basis for the redetermination." Treasury Regulations § 1.167(a)–1(b). A retroactive change for "open" years, if allowed, would, at least, have to meet this test.

5. Massey Motors v. United States, 364 U.S. 92, 102, 80 S.Ct. 1411, 4 L.Ed.2d 1592. See also Treasury Regulations § 1.167(b).

6. Johnson v. Commissioner of Internal Revenue, 4 Cir., 302 F.2d 86, 88.

7. 26 U.S.C.A. § 167(b).

8. If the original use of the property commenced with the partners, and commenced after December 31, 1953. 26 U.S.C.A. § 167(c) (2).

During the taxable period ending January 1, 1955, an air compressor and certain conveyor equipment belonging to the partnership were destroyed when a defectively manufactured explosive malfunctioned. The equipment was replaced at a cost of $22,425.82, which amount the partnership debited to expense on company books. Later, apparently, that amount was included on the partnership tax return in the deductions for business expense. After the damaged property had been replaced, the company received $22,500 from the manufacturer of the explosive as payment for part of the damage done. This amount was credited to expense when received and, presumably, returned as income in that year, or reduced the expense deduction by that amount. The Commissioner disallowed the deduction, characterizing the cost of the replacement of the equipment as a capital expenditure, without any compensating adjustment for the amount received in reimbursement.

In the Tax Court the taxpayers' principal argument was that the expenditure was one for repairs, and was properly deducted as an expense. In the opening statement of counsel below, however, it was contended that the two items offset each other,[9] and in their brief filed below, the taxpayers argued that the replacement cost, offset by the reimbursement, could reasonably be treated as a casualty loss under § 165 [10] or as an involuntary conversion under § 1033.[11]

The argument that the cost of the new equipment was properly expensed has been abandoned in this Court.

The Tax Court recognized that "in all likelihood there should have been some adjustment if the cost of the replacements must be capitalized," but declined to consider the casualty loss and involuntary conversion arguments, because they were raised for the first time on brief.[12] It refused to hold that the erroneous expense item was corrected by the offsetting credit because there was "no evidence showing when the $22,500 was received, what year it was credited to expense, whether the destroyed equipment had any remaining basis and, if so, the amount thereof, or whether a loss was claimed as a result of the destruction on the old equipment." We think the Tax Court judge's own awareness of important, unresolved questions of fact requires a remand for further inquiry.

We are puzzled at the Tax Court's inability to determine, from the returns in evidence, whether a casualty loss was claimed as a result of the accident. We also think that the depreciation records of the company should reveal the basis, if any, of the destroyed property. If no such property is listed thereon, this fact, plus the partnership's attempted tax treatment of the replacement costs, would indicate that the replaced property was either expensed in the year of acquisition, or had a zero basis through depreciation. This can be determined on remand.

■ The destruction of property, followed by reimbursement and replacement, can be treated as an involuntary conversion, upon which gain is realized only to the extent the reimbursement exceeds the replacement cost.[13] The replacement property assumes a basis equal to that of the destroyed asset. We perceive no reason why the destruction and replacement, followed immediately, or soon, by reimbursement, should not have been so treated.[14]

The case will be remanded to the Tax Court for further consideration of this

---

9. The partners recognized income at least, of course, to the extent the reimbursement exceeded the loss.

10. 26 U.S.C.A. § 165.

11. 26 U.S.C.A. § 1033.

12. Citing Eleanor C. Shoemaker, 38 T.C. 192. As noted above, however, there was adversion to the contention in counsel's opening statement.

13. 26 U.S.C.A. § 1033(a) (3) (A).

14. See 3 Mertens, Law of Federal Income Taxation, § 20.173 at 774 and the legislative history to § 1033(a) (3) (B) of the Internal Revenue Code of 1954, cited therein at footnote 66.

contention. Otherwise, the Tax Court's decision is affirmed.

Affirmed in part and remanded in part for further proceedings not inconsistent with this opinion.