NATIONAL AMUSEMENTS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
National Amusements, Inc. v. Commissioner
Docket No. 9833-79.
United States Tax Court
T.C. Memo 1982-212; 1982 Tax Ct. Memo LEXIS 535; 43 T.C.M. (CCH) 1140; T.C.M. (RIA) 82212; April 21, 1982. *535 Held: The useful life of petitioner's indoor motion picture theaters is 15.82 years. Burton L. Williams, for the petitioner. David N. Brodsky, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION
NIMS, Judge: Respondent determined income tax deficiencies against petitioner as follows for the fiscal years indicated: September 3, 1974
$ 139,799
September 2, 1975
185,836
August 31, 1976
182,251
In his notice of deficiency *536 dated April 12, 1979, the respondent determined that the useful life of petitioner's theater buildings should be 30 years instead of the 20 years claimed by petitioner. Petitioner had used a 20-year useful life from 1966 through the period before the Court. Subsequent to filing its petition herein, petitioner amended its petition and claimed a useful life of 15 years which, if allowed, would result in an overpayment by petitioner for each fiscal year herein. The parties have agreed that for the purpose of this case all indoor theaters owned by the petitioner have the same appearance and structure as petitioner's theater number 700 located in Woburn, Massachusetts. The trial of this case preceded upon the basis that our determination of the useful life of such theater would apply to all of petitioner's indoor theaters. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto (with the exception of the stipulation relating to an Internal Revenue Service Appellate Division Action/Transmittal Memorandum and Supporting Statement dated July 12, 1977, to the admission of which respondent objected) are incorporated herein by *537 this reference. The petitioner is a corporation with its principal office at 31 St. James Avenue, Boston, Massachusetts 02116, at the time of the filing of the petition herein. The main business of the petitioner is the operation of motion picture theaters at which motion pictures are exhibited to the public for an admission charge. As of August 31, 1976, the petitioner operated 20 indoor theaters. Of these theaters, 19 were owned by the petitioner and one was leased. The 19 theaters owned and operated by the petitioner as of August 31, 1976, were all freestanding buildings located on land owned by the petitioner. The one theater leased by the petitioner was located in a shopping center. The petitioner exhibits first-run motion pictures at its theaters. These theaters are generally multi-screen complexes consisting of several separate auditoriums located in the suburbs of metropolitan areas. The following schedule shows the number of theaters acquired or constructed by the petitioner from its inception through the year 1976: Number of
Year
Theaters
1965
4
1966
1
1968
2
1969
2
1970
1
1972
1
1973
3
1974
1
1975
3
1976
1
Total
19
*538 The following schedule shows the 19 theaters operated by the petitioner during the period before the Court, and any additional theaters as of September 1, 1981. Said theaters were owned by the petitioner except where designated "leased": Location
Theater No.
Number of Multi-Screens
Worcester, Mass.
200
Cinema No. I
Toledo, Ohio
280
Cinemas No. I-IV
Springfield, Mass.
310
Cinemas No. I-VIII
Lawrence, Mass.
350
Cinemas No. I-IV
Boston, Mass.
360
Circle Theater I, II & III
Louisville, Ky.
370
Cinemas I-IX
Worcester, Mass.
410
Cinemas I-IV
Milan, Ill.
420
Cinemas I-VIII
Orange, Conn.
470
Cinemas I-V
Pontiac, Mich.
490
Cinemas I-V
Franklin Park, Ohio
610
Cinemas I-V
East Hartford, Conn.
690
Cinemas I-VIII
Woburn, Mass.
700
Cinemas I-VI
Springdale, Ohio
710
Cinemas I-VII
Pittsburgh East, Penn.
720
Cinemas I-V
Sterling Hghts., Mich.
730
Cinemas I-X
Seekonk, Mass.
740
Cinemas I-VI
Erlanger, Ky.
750
Cinemas I-VII
Harbor Woods, Mich.
800
Beacon East Twin Cinema
Shrewsbury, Mass.
810
Cinemas I & II (leased)
Pittsburgh West, Penn.
820
Cinemas I-VIII
Pittsburgh N., Penn.
830
Cinemas I-VIII
Hamden, Conn.
840
Cinemamart I & II (leased)
Flint, Mich.
850
Cinemas I-VI
Cincinnati East, Ohio
860
Cinemas I-VI
Worcester, Mass.
910
Cinemas I & II (leased)
*539 Theater No. 700 located in Woburn, Massachusetts, consists of a one-story theater building constructed in 1973. The present configuration consists of six individual auditoriums under one roof which are used exclusively for motion picture exhibitions. Originally the floor plan of this theater included four individual auditoriums, but two of the larger auditoriums, Cinemas I and II, were partitioned during 1975 and 1980, respectively. The building is of masonry construction with a fixed glass window wall facade and it is fully air-conditioned. The main floor building area measures 36,200 square feet plus approximately 3,500 square feet of mezzanine space. The building is a single purpose building due primarily to be slope of the floor, a 15 to 20 degree grade, from the front to the rear. OPINION The petitioner, as an assignment of error, alleged in its petition and the amendment thereto that the Commissioner failed to give due consideration to the factor of economic obsolescence. [1] Petitioner produced a number of expert witnesses whose testimony was intended to show that the motion picture theater industry was, during the years in question, in a state of economic turmoil, *540 uncertainty and decline. Respondent produced an expert witness to prove the contrary. While the testimony on this point was, on the whole, interesting and no doubt well-informed, we conclude that speculation as to the economic future of the motion picture theater business as a whole would be an inappropriate exercise on the part of this Court, at least as to this case, and would furnish no basis whatsoever on which to determine the useful life of petitioner's theater buildings. We therefore decline the opportunity to engage in such an undertaking. As indicated infra, however, the respondent's regulations require that, in determining the useful life of property, economic changes as to that property are to be considered, and we have done so. Section 1.167(a)-1(b), Income Tax Regs.
*541 We have previously noted that the parties stipulated that for purposes of this case all indoor theaters owned by petitioner have the same appearance and structure as petitioner's theater number 700 located in Woburn, Massachusetts. The only evidence relating to appearance and structure introduced by either party pertained to this particular building, and consisted of the expert appraisal opinions of two witnesses, one produced by each party. The case, then, reduces itself to a determination of the useful life of petitioner's abovementioned theater number 700. Section 167(a)[2] provides in relevant part: SEC. 167. DEPRECIATION. (a) GENERAL RULE.--There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)-- (1) of property used in the trade or business, * * * Petitioner's expert witness, Robert M. Drennan, appraised the property as of August 31, 1977. [3] In making his determination of the annual rate of depreciation for the building and structures, Drennan took *542 into consideration physical, functional and economic depreciation. In his valuation report he defined these terms as follows: Physical Depreciation Physical depreciation is defined as the reduction in utility resulting from an impairment of the physical condition. Functional Depreciation Functional depreciation is the loss in value due to such factors as overcapacity, overimprovement, inadequacy and changes in design. It is also the inability of a structure to perform adequately and competitively the function for which it is currently employed. Economic Depreciation It is the impairment of desirability or useful life arising from factors external to the property, which affect the supply-demand relationships in the market. The forces responsible for economic depreciation include rerouting of traffic, excessive costs for fuel, flood conditions, and the like. In preparing to write his report, Drennan spent three or four days at the building site. While there, he spent a considerable *543 amount of time with the blueprints for the building in order to calculate how much steel, aluminum, siding, etc., were in the building. He testified that he "broke it down into 18 structural components * * * the idea or basis of this was to develop the cost to reproduce each component and then you -- from that you add up all the 18 components and you get the cost to reproduce the building, as of 1977." On this basis Drennan determined the total reproduction cost of the building, as of August 31, 1977, to be $ 1.4 million. [4]
*544 Drennan then proceeded to determine the useful life of the building. Having determined the reproduction cost of each of the 18 components, he arithmetically calculated the percentage of the whole which each component represented. Since the building was constructed in 1973, it was four years old as of August 31, 1977, and Drennan estimated the respective percentage of physical, functional and economic depreciation suffered by each component at the end of four years. By totaling these three percentages and multiplying such total by the percentage of the entire reproduction cost represented by the respective component, he thus computed the weighted depreciation of each such component. He next totaled the weighted depreciation of all 18 components, and thereby arrived at total four-year depreciation, or 25.29 percent of the total reproduction cost. By dividing 25.29 percent by four years, he computed the annual rate of depreciation to be 6.32 percent. Finally, by dividing the annual depreciation rate of.0632 into 100, he determined the useful life of the building to be 15.82 years. Appendix A reflects the details of Drennan's calculations. Drennan's report contains numerous *545 photographs demonstrating substantial deterioration of the building. Some of this he attributed to the fact that the structure was built, without pilings, on peat and silty loam, neither of which, he stated, is notable for its load-bearing characteristics. While it might be argued that, notwithstanding the parties' stipulation that theater 700 was typical of all of petitioner's buildings, it would be unfair to attribute bad substructures to all of the theaters, we think there is substantial merit to Drennan's observation that "they didn't put piling under there because they, perhaps, didn't think it was going to last 30 or 20 years -- it was just to last a short time." It would not be unreasonable to attribute such a philosophy to petitioner's management in the construction of all of petitioner's buildings. Drennan explained his reason for attributing economic and functional depreciation to the building as follows: "After this building was put up and when the great energy crisis came [in 1973-74], Massachusetts said that all public buildings like this had to have insulated walls. This building does not have insulated walls." Also, the 3,000 square feet of glass across the front *546 of the building is single-thickness rather than dual-pane. Among other things Drennan's report also pointed out that the building was originally constructed to house four theaters, but subsequently was subdivided into six theaters. As a consequence, the building's two cooling/heating units are misplaced and are inadequate as to Cinema 3 and overadequate as to Cinema 2. Respondent's expert witness, John E. Housiaux, was also a well-qualified appraiser. However, his testimony is of limited value because he was expressly instructed to limit his appraisal to the physical, rather than useful, life of the structure. [5] That Housiaux was aware of the concept of "useful life," as contrasted with "physical life," is manifest from his report, which contains the following definition: Useful Life - a depreciation period usually measured by years, in which a building component may reasonably be *547 expected to be useful to the taxpayer in his trade or business or in the production of income. This definition considers physical deterioration as well as functional and economic obsolescence. [Emphasis supplied.] It will be observed that Housiaux' definition of useful life is a reasonable paraphrase of the definition contained in respondent's own regulation, and expressly includes physical deterioration as well as functional and economic obsolescence, factors taken into account by Drennan but not, as to the latter two, by Housiaux. Section 1.167(a)-1(b), Income Tax Regs. provides, in relevant part as follows: Sec. 1.167(a)-1. Depreciation in general. (b) Useful life. For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in his trade or business or in the production of his income. This period shall be determined by reference to his experience with similar property taking into account present conditions and probable future developments. Some of the factors to be considered in determining this period *548 are (1) wear and tear and decay or decline from natural causes, (2) the normal progress of the art, economic changes, inventions and current developments within the industry and the taxpayer's trade or business, (3) the climatic and other local conditions peculiar to the taxpayer's trade or business, and (4) the taxpayer's policy as to repairs, renewals, and replacements. Salvage value is not a factor for the purpose of determining useful life. * * * This regulation is consistent with the holding of the Supreme Court in Massey Motors, Inc. v. United States,364 U.S. 92 (1960). We are accordingly mystified as to respondent's motive for expressly limiting the scope of Housiaux's expert report to the physical, rather than useful, life of theater 700. Respondent's only other witness testified that on the basis of a study he conducted there is no evidence that first-run, first class theaters ingeneral are experiencing economic obsolescence. General economic obsolescence of motion picture theaters is the only subject on which he testified. However, like petitioner's expert testimony on the same subject, we view the nature of this testimony as being so inherently *549 speculative as to lack any significant probative value for purposes of determining useful life. Unfortunately for respondent's case, there is no logical basis upon which this Court can meld Housiaux's testimony with that of the economic obsolescence witness to determine the useful life of theater 700. If that was respondent's strategy in limiting Housiaux's testimony (and for lack of any other clue we can only surmise that it was), the strategy failed. Furthermore, even Housiaux's opinion as to physical life is suspect. Housiaux put the replacement cost of theater 700 at $ 1,447 million, within $ 47,000 of Drennan's figure, so the two witnesses are substantially in agreement on the starting point. Housiaux testified, however, and his written report reflects, that he consulted five authoritative data sources, plus material gained from telephone conversations with material manufacturers, trade associations and those whom he considered knowledgeable on the properties of materials and completed construction items to determine the physical lives of 14 identified components of the building. He admitted, however, that his report modified the information contained in the five data sources *550 because in them "there is the factor of economic life or useful life associated with it * * *." The basis for or extent of such modifications is not clear from the record. Housiaux also admitted that he did not personally confer with the unidentified "knowledgeable" individuals, nor did Housiaux' associate (who did not testify but who conducted the telephone interviews) do anything more than make generalized inquiries and report back orally to Housiaux. The associate did not inform any of the conferees as to the specific use to which any of the materials involved was put. Housiaux concluded that "the range of the composite physical life expectancy for Cinema No. 700 in Woburn, Massachusetts, is reasonably represented by a time interval from 32.5 to 41.1 years." However, for reasons stated, we reject Housiaux's conclusion as not probative of useful life within the meaning of section 167(a) and section 1.167(a)-1(b), Income Tax Regs. Housiaux's composite physical life calculation is reproduced as Appendix B. Petitioner's president, Sumner E. Redstone, testified that from the date of its incorporation in 1966 through 1980, the useful life used by the petitioner on its returns *551 for its theaters was 20 years. The regulations provide that a redetermination of useful life will be made only if there is a significant change in useful life and a clear and Convincing basis for redetermination. Section 1.167(a)-1(b), Income Tax Regs.
There is no evidence in the record before us, much less a clear and convincing basis, upon which to justify the respondent's redetermination of the useful life consistently used by the taxpayer for the first 14 years of its existence. There is, however, a convincing basis (consisting, in fact, of the only convincing evidence in the case) for granting petitioner's claim for overpayment of tax based upon a useful life of less than 20 years. We hold that the useful life of each of petitioner's indoor motion picture theaters is 15.82 years. To eflect the foregoing, Decision will be entered under Rule 155.
APPENDIX A DEPRECIATION ANALYSIS CINEMA BUILDING, WOBURN, MASSACHUSETTS BY ROBERT M. DRENNAN BUILDING
As of August 31, 1977 (1)
(2)
Comput.
(1) as a %
Reprodn.
of bldg.
COMPONENT
Cost
cost=(1) *
SUBSTRUCTURE: Reinf. concrete stem wall, footings and slab,
excavation, backfill and site work.
$ 136,230
0.096
SUPERSTRUCTURE: Structural Steel
29,210
0.021
Exterior Walls, masonry, glass
129,885
0.092
Exterior doors, metal, glass
10,435
0.007
Interior walls and partitions
189,650
0.135
Mezzanine floor and stairways, reinf. concrete
6,210
0.004
Roof frame, bar joists
79,560
0.056
Roofing
95,865
0.069
CEILINGS: Suspended, fiberglass acoustic panels, ceiling
tile and gypsum board
98,900
0.070
INTERIOR: Painting, ceramic tile and miscellaneous fittings
32,780
0.023
Doors, metal and wood
14,745
0.011
Flooring, vinyl tile
11,910
0.008
Counters
42,300
0.030
Screens w/masking
6,205
0.004
Walls panels, corrg. alum.
78,570
0.056
BUILDING SERVICES: Mechanical, heating and AC piping, ductwork,
plumbing fixtures, etc.
243,380
0.173
Electric, wiring, controls, apparatus, etc.
130,380
0.092
OUTWORKS: Podium, paving, ramps, etc.
73,845
0.052
TOTALS
* $ 1,410,100
1.000
*552 Depreciation
(3)
(4)
(5)
%
%
%
COMPONENT
Phys
Func
Econ
SUBSTRUCTURE: Reinf. concrete stem wall, footings and slab,
excavation, backfill and site work.
21
2
.5
SUPERSTRUCTURE: Structural Steel
21
.5
Exterior Walls, masonry, glass
21
10
.5
Exterior doors, metal, glass
20
5
.5
Interior walls and partitions
20
.5
Mezzanine floor and stairways, reinf. concrete
20
.5
Roof frame, bar joists
21
.5
Roofing
37
.5
CEILINGS: Suspended, fiberglass acoustic panels, ceiling
tile and gypsum board
25
.5
INTERIOR: Painting, ceramic tile and miscellaneous fittings
30
.5
Doors, metal and wood
22
.5
Flooring, vinyl tile
25
.5
Counters
22
.5
Screens w/masking
25
.5
Walls panels, corrg. alum.
25
.5
BUILDING SERVICES: Mechanical, heating and AC piping, ductwork,
plumbing fixtures, etc.
22
5
.5
Electric, wiring, controls, apparatus, etc.
20
.5
OUTWORKS: Podium, paving, ramps, etc.
20
.5
(6)
W'gt'd
Deprc=(2) X
COMPONENT
(3+4+5)%
SUBSTRUCTURE: Reinf. concrete stem wall, footings and slab,
excavation, backfill and site work.
2.26
SUPERSTRUCTURE: Structural Steel
0.45
Exterior Walls, masonry, glass
2.90
Exterior doors, metal, glass
0.18
Interior walls and partitions
2.77
Mezzanine floor and stairways, reinf. concrete
0.08
Roof frame, bar joists
1.20
Roofing
2.80
CEILINGS: Suspended, fiberglass acoustic panels, ceiling
tile and gypsum board
1.79
INTERIOR: Painting, ceramic tile and miscellaneous fittings
0.70
Doors, metal and wood
0.25
Flooring, vinyl tile
0.20
Counters
0.68
Screens w/masking
0.10
Walls panels, corrg. alum.
1.43
BUILDING SERVICES: Mechanical, heating and AC piping, ductwork,
plumbing fixtures, etc.
4.75
Electric, wiring, controls, apparatus, etc.
1.89
OUTWORKS: Podium, paving, ramps, etc.
1.07
TOTALS
25.29
*553 TOTAL DEPRECIATION 25.29 RATE OF DEPRECIATION = 25.29 = 6.32%/year 4 yrs. APPENDIX B COMPOSITE PHYSICAL LIFE CALCULATION BY JOHN E. HOUSIAUX SHOWCASE CINEMA NO. 700 WOBURN, MASSACHUSETTS
(1)
(2)
(3)
(4)
REPRODUCTION
PHYSICAL LIFE
ANNUAL
COST NEW
(LOWER)
DEPRECIATION
COMPONENT DESCRIPTION
(1981 COSTS)
$ Years
$
1.Foundation
65,000
75
867
2. Structural Support System
40,000
75
533
3. Roof Structure
170,000
75
2,267
4. Roof Cover
50,000
15
3,333
5. Exterior Walls
240,000
75
3,200
6. Floor Structure
135,000
75
1,800
7. Interior Construction
195,000
75
2,600
8. Floor Covering
17,000
20
850
9. Acoustical System
150,000
15
10,000
10. H.V.A.C.
175,000
15
11,667
11. Electrical Power
System
75,000
50
1,500
12. Electrical Lighting
System
80,000
20
4,000
13. Plumbing/Piping System
15,000
40
375
14. Plumbing Fixtures
40,000
25
1,600
Totals
$ 1,447,000
$ 44,592
(5)
(6)
PHYSICAL LIFE
ANNUAL
(UPPER)
DEPRECIATION
COMPONENT DESCRIPTION
Years
$
1. Foundation
100
650
2. Structural Support System
100
400
3. Roof Structure
100
1,700
4. Roof Cover
18
2,778
5. Exterior Walls
100
2,400
6. Floor Structure
100
1,350
7. Interior Construction
100
1,950
8. Floor Covering
25
680
9. Acoustical System
20
7,500
10. H.V.A.C.
18
9,722
11. Electrical Power
System
60
1,250
12. Electrical Lighting
System
25
3,200
13. Plumbing/Piping System
50
300
14. Plumbing Fixtures
30
1,333
Totals
$ 35,213
*554 COMPOSITE PHYSICAL LIFE 1,447,000 / 44,592 = 32.45 years 1,447,000 / 35,213 = 41.09 years Footnotes
1. Section 1.167(a)-9, Income Tax Regs., provides: Sec. 1.167(a)-9. Obsolescence. The depreciation allowance includes an allowance for normal obsolescence which should be taken into account to the extent that the expected useful life of property will be shortened by reason thereof. Obsolescence may render an asset economically useless to the taxpayer regardless of its physical condition. Obsolescence is attributable to many causes, including technological improvements and reasonably foreseeable economic changes. Among these causes are normal progress of the arts and sciences, supersession or inadequacy brought about by developments in the industry, products, methods, markets, sources of supply, and other like changes, and legislative or regulatory action. In any case in which the taxpayer shows that the estimated useful life previously used should be shortened by reason of obsolescence greater than had been assumed in computing such estimated useful life, a change to a new and shorter estimated useful life computed in accordance with such showing will be permitted. No such change will be permitted merely because in the unsupported opinion of the taxpayer the property may become obsolete at some later date. For rules governing the allowance of a loss when the usefulness of depreciable property is suddenly terminated, see sec. 1.167(a)-8. If the estimated useful life and the depreciation rates have been the subject of a previous agreement, see section 167(d)↩ and sec. 1.167(d)-1. [Reg. sec. 1.167(a)-9.]
2. All section references are to the Internal Revenue Code of 1954 as in effect for the years at issue.↩
3. The record does not clearly indicate why this particular date was selected, since the years before the Court are the petitioner's fiscal years ended August 31, 1974, 1975 and 1976.↩
4. Both Drennan and John E. Housiaux, respondent's appraisal expert, determined the reproduction cost of the property; Drennan determined the reproduction cost as of August 31, 1977, and Housiaux determined such cost "stated in terms of 1981 levels." The purpose of developing costs by components is not to develop historical cost, but rather to obtain a relative weighting of costs by components so that the amount of depreciation on a life basis can be allocated among components and then composited into a total life estimate for the entire structure. Housiaux testified that this methodology is standard among appraisers in conducting useful, economic or physical life studies, and since both appraisers proceeded on this basis we have no quarrel with the use of such methodology for purposes of this case.↩
5. Housiaux stated that, while he previously had testified in over 50 proceedings, "I have not [testified] on the physical aspect or the physical life only. It may have involved other considerations of depreciation in addition to the element of physical life or physical wear and tear."↩
*. $ 1,410,100, total reproduction cost, rounded↩